# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| SAJIDA JOHNSON, | CASE NO. 12cv1717 JM(BLM) |
|---|---|
| Plaintiff, | ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT |
| vs. | |
| JOHNS HOPKINS UNIVERSITY APPLIED PHYSICS LABORATORY LLC, | |
| Defendant. | |

Defendant Johns Hopkins University Applied Physics Laboratory LLC ("APL") moves for summary judgment on all claims asserted in Plaintiff Sajida Johnson's whistleblower complaint. Plaintiff opposes the motion and, alternatively, moves for summary judgment. For the reasons set forth below, the court grants APL's motion for summary judgment, denies Plaintiff's motion for summary judgment, and instructs the Clerk of Court to close the file.

## BACKGROUND

**The Claims**

On June 5, 2012, Plaintiff commenced this action in the Superior Court for the County of San Diego by alleging two causes of action for (1) retaliation for refusing to participate in conduct violating Labor Code §§1102.5 and 1102.6 and (2) wrongful termination in violation of public policy. In broad brush, Plaintiff alleges that she blew

the whistle on APL's wrongful conduct and, as a consequence, suffered a retaliatory discharge. On July 11, 2012, APL removed this diversity action to this court. (Ct. Dkt. 1).

**Plaintiff's Employment with APL**

On June 28, 2010, Plaintiff was hired by CDI Corporation as an analyst for a leased-worker position with APL. (Johnson Depo. 17:10-19:1). Plaintiff was then employed by APL from about June 2010 through December 23, 2011 as a Business Analyst and later as a Project Manager. (Compl. ¶9). From June 28, 2010 thru June 2011, Plaintiff worked on various projects at Camp Pendleton. In early to mid 2011, APL offered Plaintiff a full-time position as an APL employee. Plaintiff declined the offer because she could make more money as a leased-worker with CDI. (Id. at 27:19-29:8).

In July 2011, the Bureau of Navy Medicine and Surgery ("BUMED"), the agency that oversees Navy Medicine and the Naval Medical Centers, retained APL to perform a process improvement project located at the Naval Medical Center in Portsmouth, Virginia ("NMCP"). APL has a multi-faceted contract with the U.S. Naval Sea Systems Command ("NAVSEA"), under which there is a task order with BUMED for APL to provide performance improvement services to Navy Medicine. (Ward Depo. 28:20-30:6; 99:21-101:13). When a specific contract is assigned to APL under the contract, BUMED generally creates a statement of work defining the scope of the project. (Id. at 101:14-102:22). Tim Ward ("Ward"), BUMED's Deputy Director of the Office of Program Analysis and Evaluation, is responsible for determining the scope of the project, to ensure the contractors follow the scope, and to ensure that the project's deliverables are achieved. (Id. 30:19-31; 47:5-48:6). Ward was the sponsor of the BUMED/APL contract at issue. (Id. at p.47:19-22).

In order to carry out the performance improvement project at NMCP, APL assigned Plaintiff as the Project Manager. APL also assigned Leon Stafford to assist her and Kara Tuohey, APL's Chief Engineer, as a technical advisor. (Tuohey Depo.

19:10-13; 29:9-13). The performance improvement project was requested by BUMED. BUMED tasked APL to build a spine template that had been recommended by the Navy's Musculoskeletal Continuum of Care Advisory Board ("MCCAB").

**Ward's Testimony, Generally**

Ward testified that, from BUMED's perspective, the project had several different objectives. (Ward Depo. 24:4-5). The primary purpose of the project "was to look at the functioning of AHLTA (Armed Forces Health Longitudinal Technology Application, the military's online electronic medical record system) in orthopedic clinics and to see if there was anything that could be done to improve how the providers use AHLTA, and to improve the amount of time that the providers have to [] interact with AHLTA versus interacting with the patients." (Ward Depo. 25:6-15). BUMED also wanted to determine whether the time spent in AHLTA by physicians could be reduced, whether patient flow could be improved, whether referrals by primary care physicians to orthopedists could be reduced, and whether the number of patients seen by orthopedic surgeons could be increased. (Id. 23:20-28:19). Ward also testified that physicians spend as much time documenting in AHLTA as they do talking to patients and that trying to improve the use of AHLTA was one of the goals of the project. (Id. 15:5-10). Ward also testified that an average primary care appointment took 10 to 15 minutes 15 years ago but today each appointment is 20 minutes. (Id. 23:8-11). Ward also noted that orthopedic injuries are the number one reason that active duty Navy personnel are unable to perform their duties.

Ward also testified that one difficulty with the project was implementation by primary care physicians. Ward cited studies indicating that compliance by primary care physicians with new clinical practice guidelines ("CPGs"), such as implementation of the proposed spine template, is less than 25%. (Id. 18:9-16). From the inception of the project, Ward did not have "any great expectations that the primary care doctors were going to follow the template." (Id. 22:16-17).

Ward explained that BUMED's projects are broken into four phases or parts:

scoping, diagnostic, implementation, and sustainment. The spine project template ended at the end of the diagnostic phase of the project. Ward directed the project to stop because there was "no significant findings of where to move that future state (phase), and there was no implementation plan of how to actually get to that result. There was nothing to implement." (Id. 64:2-15). Ward met with Captain Daniel Unger, M.D. ("Unger") to discuss his decision to end the project and told him that APL was going to complete and hand over the template for the NMCP to implement. One part of the project, called the AIM form (the history and physical exam for people with back pain), was developed by APL and has been adopted by BUMED. (Unger Depo. 42:4-12).

**Captain Unger's Testimony, Generally**

Unger, chairman of the MCCAB and an orthopedic surgeon at NMCP, served as clinical organizer or champion for the project, overseeing the clinical content for the template. Unger, a former chairman of MCCAB, "thought it would be of benefit for the Navy . . . [to] come up with a centralized, consistent spine template to evaluate back pain that would incorporate the CPGs within the template so there would be consistent evaluation and treatment throughout the Navy following the clinical practice guidelines. . . ." (Unger Depo. 13:8-23). After several meetings with MCCAB members, Unger testified that "it became obvious that the AHLTA infrastructure would not allow us to develop a comprehensive spine template from the subjective and objective all the way through the assessment and plan." (Id. 16:16-20). Staff at the hospital made Unger aware of this fact. (Id.17:1-2). Unger also testified that decreasing inappropriate referrals was not necessarily one of the objectives of the study. His "hope" for the project was "to standardize the evaluation and treatment per the clinical practice guidelines Navy-wide and potentially DOD-wide so bottom line is to provide consistent and thorough care throughout the enterprise for back pain. I think the offshoot from other perspectives was that it may impact clinical referral patterns and things like that." (Id. at 9.18:16-22). He also noted that the development

of a spine template could, if successful, result in fewer inappropriate referrals and fewer MRIs ordered. (Id. at 19:5-11).

Unger identified that the use of the template, if successful, would result in improved patient care. (Id. 37:4). Even if the number of referrals to a specialist did not decline under the project, the project would be a success "because it would standardize the documentation and the diagnosis and give treatment, standardized treatment algorithms per the CPGs for low back pain to primary care providers who at the current state do not have such a template to go by." (Id. 38:17-22). No one at APL ever told Unger that the template could reduce inappropriate referrals. (Id. 19:12-16). Unger never focused on whether the template would reduce inappropriate referrals. (Id. 33:8-19). Unger learned in October or November 2012 that the project would not proceed to the implementation phase. (Id. 39:8-12; Johnson Decl. ¶7).

In Unger's view, there were two reasons why the project was not successful. First, there was a technical issue with the AHLTA system that was not compatible with the spine template and, second, the "primary care physicians were mandated to use the Tri-Service workflow and they couldn't use any other template." (Id. 43:20-44:4).

**Plaintiff's Testimony, Generally**

Plaintiff declares that Ward "exercised inappropriate influence over the direction of the project." (Johnson Decl. ¶4). APL "was supposed to take its direction from Captain Unger" because MCCAB was the client. However, Ward took a different approach to the project and provided contradictory direction to APL concerning the scope of the project. (Id. ¶5). "The scope of the project was never clearly defined and throughout the life of the project, the scope continually changed." (Id. ¶8). The goals of the project included making AHLTA easier to use, enabling physicians to spend more time with patients, and reducing the number of inappropriate referrals to surgery. (Id. ¶10).

Early on in the project, Plaintiff told Kara Tuohey, APL's chief engineer, and Robert Beasley, a BUMED engineer, that "the template could not accomplish all of

those goals." (Id. ¶11). Plaintiff explains that, "[b]ecause of the way AHLTA is programmed, the physicians did not have to fill out all the boxes in the template before ordering a particular procedure. If the physician chose to only fill out the patients' name and birthday, nothing in AHLTA's programming code could stop the physician from referring that patient on to surgery." Plaintiff further explains that the military does not possess the proprietary rights to the source code and that the program could not be reprogrammed. (Id. ¶11). Even if physicians could be forced to use the template, one could not determine whether there was any reduction in referrals because no one knew what percentage of the surgery and MRI referrals were inappropriate before the template was implemented. As noted in a July 21, 2011 email from Plaintiff to Robert Beasley, "[i]f the chief complaint is that we need to reduce the number of referrals, this will not be accomplished by new/revised templates alone. This is an access issue that involves BUMED and how they process consults." (Plaintiff's Exh. 2). Beasley responded that "[i]t should not be the expectation of the contractor to lower the inappropriate referrals." (Beasley Depo. 81:17-19).

Johnson informed her supervisors that "the template would not have an effect on inappropriate referrals." (Johnson Decl. ¶13). When Plaintiff and Stafford raised their concerns that the template would not do what Unger and MCCAB thought it would do, Tuohey, Plaintiff's supervisor, would say, "Let's go forward. Let's continue to work on it. It will be okay." Tuohey also informed Plaintiff that Ward "needed to score a big one" with the MCCAB. Id. She also informed Mr. Beasley, a BUMED representative, that the project was a waste of money. (Id. at ¶15).

On September 28, 2011, Captain Henry requested an update on the project. After providing the update, Captain Henry called APL's work a "high school science project" and stated that the template project was no longer authorized by the MCCAB. (Id. ¶16). (Id. ¶16). The official reason for ending the project "at the end of the diagnostic phase instead of moving on to the implementation phase was because the project was not going to be successful." However, Plaintiff represents that Ward and

Beasley blamed the failure of the project on a lack of assistance from Unger. (Johnson Depo. 361:11-22).[1]

On December 16, 2011, an out-briefing was scheduled to discuss several different projects including the spine template project. (Ward Depo. 80:10-12). Ward and Beasley generally attributed the failure of the project to a lack of assistance from Unger. (Johnson Depo. 361:11-22). Tuohey and Hopfinger blamed the failure of the project on Plaintiff and Stafford. (Hopfinger Depo. 89:6-21). Smith and Turgeon, both with APL, informed Plaintiff that there might not be any work for her once Plaintiff completed work on a Strategic Sourcing project but that they would follow up with Ms. Johnson when they had more information. (Johnson Decl. ¶19).

On December 19, 2011, Unger returned from a long vacation and called Plaintiff to ask why no one appeared for the regular weekly AHLTA template meeting. (Johnson Decl. ¶20). Unger "might not be aware of the termination of the project" and he stated that he felt "blindsided." Id.[2] On December 21, 2013 Plaintiff sent Unger an email detailing her views on the reasons why the project was not successful. In the email, Plaintiff told Unger that the project never had the capacity to "reduce inappropriate referrals and MRI's." (Plaintiff's Exh. 1). She also indicated that the "project was poorly and inadequately scoped on the part of APL." She also stated that, "[d]espite [her] concerns, objections and warnings regarding diagnostic, metrics and implementation, the project began on 9/6/11 without a signed statement of work between APL and BUMED." Id. She believed that the project was a waste of money and that she was "disgusted by the behavior of APL and Mr. Ward." Id.

---

[1] Plaintiff cites this portion of her deposition testimony. However, the court could not locate this testimony in the record submitted by the parties. The court notes other instances where the court could not locate the evidence cited by Plaintiff. For example, on pages 13 and 14 of her opposition, Plaintiff cites the Smith deposition at pages 189:7-191:8. However, the Smith deposition submitted by Plaintiff does not contain those pages nor does APL's submission. The court highlights that evidence cited, but not attached as an exhibit, has not been considered on this motion. See Fed.R.Civ.P. 56(c)(4).

[2] The court notes that Unger testified that he was not misled or blindsided by anyone from APL or by the limitations of AHLTA.

On December 20, 2011, Plaintiff completed a diversity survey wherein Plaintiff stated that she had a negative experience working for APL because of her race. (Johnson Decl. ¶21). She also identified that there was evidence of racial discrimination within APL. She also states that some unknown person added the following sentence to the diversity survey form she completed: "I have been told that my last day with APL is January 6, 2012. Id.

On December 21, 2011, Plaintiff's domain account was modified by APL's helpdesk. (Johnson Decl. ¶21). On December 23, 2011, Plaintiff was informed by CDI Corporation that her position with APL "was over effective immediately." (Id. ¶23). Plaintiff declares that she "was terminated because I pushed back on the AHLTA template project and complained about the diversity problems I saw within my group." (Id. ¶24). Plaintiff informed Beasley, a government employee, and Unger that the project was not going to be successful, a waste of taxpayer money, and that the project would not reduce inappropriate surgery referrals and inappropriate MRI referrals. Id.

**Termination of Plaintiff**

As indicated above, Plaintiff was in a leased-worker position. At the same time Plaintiff worked on the spine project, Plaintiff was also working part time on a "Strategic Sourcing" project. (Hopfinger Decl. ¶3). Some time prior to December 20, 2011 APL informed Plaintiff it may not have any work for Plaintiff after mid-December. APL was not tasked with another BUMED project until the end of February 2012. Id.

On December 15, 2011, Patrick Hopfinger, the Group Supervisor for APL decided to terminate Plaintiff's leased-worker position "because APL did not have any projects to assign Johnson, nor was it aware of any upcoming projects that BUMED had decided to fund and assign to APL to which she could be assigned." (Hopfinger Decl. ¶6). Hopfinger also did not believe that "Johnson had been aggressive in attempting to achieve BUMED's goals for the project or advancing the project forward." Id. A December 16, 2011 email from Hopfinger to APL personnel

acknowledged his decision to terminate Plaintiff. (Hopfinger Decl. Exh. 12). On December 19, 2011, Hopfinger executed a "Notice of Termination of Leased Worker Services." (Id. Exh. 13).

# DISCUSSION

**Legal Standards**

A motion for summary judgment shall be granted where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); Prison Legal News v. Lehman, 397 F.3d 692, 698 (9th Cir. 2005). The moving party bears the initial burden of informing the court of the basis for its motion and identifying those portions of the file which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). There is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim." Id. (emphasis in original). The opposing party cannot rest on the mere allegations or denials of a pleading, but must "go beyond the pleadings and by [the party's] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (citation omitted). The opposing party also may not rely solely on conclusory allegations unsupported by factual data. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).

The court must examine the evidence in the light most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). Any doubt as to the existence of any issue of material fact requires denial of the motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). On a motion for summary judgment, when "'the moving party bears the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence were uncontroverted at trial.'" Houghton v. South, 965 F.2d 1532, 1536 (9th Cir. 1992) (emphasis in original) (quoting International Shortstop, Inc. v. Rally's, Inc., 939 F.2d

1257, 1264-65 (5th Cir. 1991), cert. denied, 502 U.S. 1059 (1992)).

**The Retaliation Claim**

Labor Code section 1102.5(b) provides:

> (b) An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.

"To establish a prima facie case of retaliation under § 1102.5(b), a plaintiff must show: (1) he engaged in protected activity; (2) his employer thereafter subjected him to an adverse employment action; and (3) a causal link between the two." Jadwin v. County of Kern, 610 F.Supp.2d 1129, 1152 (E.D. Cal. 2009) (citing Mokler v. County of Orange, 157 Cal.App.4th 121, 138 (2007). Following the McDonnell Douglas model, once Plaintiff establishes a prima facie case of retaliation, "the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action. Morgan v. Regents of University of California, 88 Cal.App.4th 52, 68 (2000). If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation 'drops out of the picture,' and the burden shifts back to the employee to prove intentional retaliation." Akers v. County of San Diego, 95 Cal.App.4th 1441, 1453 (2002).

The Protected Activity

The protected activity element has three components: a disclosure, based on reasonably based suspicions, of illegal activity. Mokler v. County of Orange, 157 Cal.App.4th 121, 138 (2007). "To have a reasonably based suspicion of illegal activity, the employee must be able to point to some legal foundation for his suspicion - some statute, rule or regulation which may have been violated by the conduct he disclosed." Turner v. City & Cnty of San Francisco, 892 F.Supp.2d 118, 1199-200 (N.D. Cal. 2012).

Plaintiff comes forward with evidence to show that she told Beasley (an industrial engineer with BUMED) as early as July 21, 2011 that the template would not

impact the number of patients inappropriately referred for surgery or MRIs. Beasley confirms that he began having doubts in September or October 2011 that the project would not reduce inappropriate referrals. Plaintiff also presents evidence to show that she informed Beasley and Unger of her belief that Ward (deputy director of BUMED) "was inappropriately directing APL's activities on the project in violation of the FAR." Plaintiff declares her belief that Ward exercised inappropriate influence over the direction of the project. Section 37.104 of the Federal Acquisition Regulations ("FAR") provides, in general, that federal employees are not allowed to create an employer-employee relationship with contractors. (Johnson Decl. ¶4). Plaintiff represents that she told Unger, Webster Smith, an assistant group supervisor at APL, and Beasley of her concerns. The email Plaintiff sent to Unger also identifies that the project was a waste of money and that referrals would not be reduced. (Johnson Exh. 1).

Plaintiff argues that the False Claim Act was violated when APL represented that the template could reduce inappropriate referrals and MRIs.[3] (Oppo. at p.20:21-21:4). A false claim is one that is presented for payment to the government that is fraudulent or simply false. U.S. ex rel. Hopper v. Anton, 91 F.3d 1261, 1266 (9th Cir. 1996). Plaintiff argues that this case is analogous to the typical case where a private employee discovers that the employer overcharged the government under a government contract. This argument is not persuasive.

Plaintiff argues that she informed her supervisors and Beasley that the project would not be successful (i.e. the project would not reduce inappropriate specialist or MRI referrals) and constitute a waste of time and taxpayer money. Plaintiff informed Beasley on several occasions of these facts and also informed Unger via email of these facts. (Plaintiff's Exh. 1). The difficulty with Plaintiff's first argument is that there is

---

[3] Plaintiff also alleges that the conduct violated several other stautes: 18 U.S.C. §648 (embezzlement of public funds by person charged with safekeeping by Act of Congress); Cal. Penal Code §470 et seq. (Prohibitions against counterfeiting and forgery); and Cal. Government Code §12650 (California's false claim act). However, Plaintiff fails to identify how any of these statutes were violated.

no evidence that anyone at BUMED or APL believed that the spine template would reduce the number of inappropriate referrals. The undisputed record shows that BUMED did not task APL with delivering a reduction of inappropriate referrals; Unger, the chairman of MCCAB, did not define the project's success by whether inappropriate referrals were reduced; Ward did not believe that the template would reduce inappropriate referrals; Beasley had doubts about the ability of the project to reduce inappropriate referrals; and Plaintiff did not believe that the project would be successful from this point of view. (Unger Depo. 15:4-21; 18:9-19:21; 33:8-39:19; Ward Depo. 16:12-28:19; Beasley Depo. 26:13-29:9). All parties testified that the manner in which primary care physicians used AHLTA would not permit the template to reduce inappropriate referrals (Ward testified that only about 25% of physicians would be likely to follow the template). (Ward Depo. 18:9-16). The court notes that there is no evidence that any person believed that (1) reducing the number of inappropriate referrals was a primary goal of the project or (2) the project would result in the reduction of inappropriate referrals.

In light of the evidence submitted by both parties, the court concludes that Plaintiff's disclosure that the template project would not be successful is not an actionable protected activity. A protected disclosure is one that tends to disclose suspicions of illegal activity. See Mokler, 157 Cal.App.4th at 138. The court concludes that there is no genuine issue of material fact with respect to whether Plaintiff disclosed any illegal activity. There is simply no evidence showing that any party represented or believed that the template would reduce inappropriate referrals. See Love v. Motion Indus., Inc., 309 F.Supp.2d 1128, 1135 (N.D. Cal. 2004) (the plaintiff's disclosure of safety concerns without reference to any statute, rule, or regulation fails to support plaintiff's belief that his employer engaged in actionable conduct).

To the extent Plaintiff argues that she engaged in a protected activity when she made the general statement to Unger and Beasley that "the project was a waste of time and money," the court concludes that this is not a protected disclosure. The fact that

the government and APL engaged in conduct considered a "waste of time and money" constitutes a generic non-actionable disclosure because Plaintiff fails to cite any statute, rule or regulation that may have been violated by such a generic statement. See Mize-Kurzman v. Marin Cmty. Coll. Dist., 202 Cal.App.4th 832, 852 (2012) (differences of opinion regarding policies the plaintiff believes to be unwise or wasteful are not "disclosures" under Labor Code §1102.5).

Plaintiff also argues that she told Tuohey, Webster Smith, and Kevin Turgeon that Ward exercised improper control over the project in violation of Section 37.104 of the FAR. Plaintiff argues that she attended a FAR seminar and she believed, "[b]ased on the presentation and her knowledge of 48 CFR §37.104(c)(1), that Ward was not allowed to direct or supervise APL's activities." (Oppo. at p.22:21-23). The only evidence cited by Plaintiff is the argument that Unger provided instruction to APL but "then Ward would instruct APL not to do what Unger wanted them to do." (Oppo. at p.23:2-3). The regulation at issue provides:

> (c)(1) An employer-employee relationship under a service contract occurs when, as a result of (i) the contract's terms or (ii) the manner of its administration during performance, contractor personnel are subject to the relatively continuous supervision and control of a Government officer or employee. However, giving an order for a specific article or service, with the right to reject the finished product or result, is not the type of supervision or control that converts an individual who is an independent contractor (such as a contractor employee) into a Government employee.

The evidence submitted by Plaintiff consists of allegations that Ward, deputy director of BUMED, provided contradictory instructions to those provided by Unger, the project champion. In her deposition testimony, Plaintiff cites no specific evidence to show that Ward engaged in "relatively continuous supervision and control" as contemplated by the regulation. Plaintiff testifies that Ward was "too involved in the decision-making for the project" and would contradict Unger, (Johnson Depo. 71:21-72:6; 166:11-22). Such conclusory statements fail to show a violation of FAR. Consequently, Plaintiff fails to meet her burden of showing that she was engaged in a protected activity. Plaintiff may not rely on conclusory allegations unsupported by

factual evidence. See Taylor, 880 F.2d at 1045.

In sum, the court concludes that Plaintiff fails to raise a genuine issue of material fact with respect to whether of not she engaged in a protected activity. APL is entitled to summary judgment on the Labor Code § 1102.5(b) claim.

Causation

In order to establish a whistleblower claim, Plaintiff must show a nexus between her conduct and her termination. See General Dynamics Corp. v. Superior Court, 7 Cal.4th 1164, 1191 (1994) (Plaintiff must show that "the employer's conduct was motivated by impermissible considerations under a 'but for' standard of causation").

Here, Plaintiff fails to show that her statements to Beasley in July 2011 to the effect that the project would not be successful (i.e. reduce inappropriate referrals) or the December 21, 2011 email to Unger is the but-for causation. The court concludes that the timing of the events does not establish the requisite causation. There is simply no evidence before the court that the stated goal of the project was to reduce inappropriate referrals. To the contrary, Unger, Ward, Plaintiff, and others all testified that the reduction of inappropriate referrals was not the goal of the project. With respect to the Unger email, the undisputed evidence shows that APL decided to end Plaintiff's leased-worker contract on December 15, 2011, six days before Plaintiff's email to Unger. Under these circumstances, Plaintiff fails to raise a genuine issue of material fact with respect to causation. While Plaintiff attempts to show causation by temporal relatedness, Jadwin, 610 F.Supp.2d at 1156 ("To establish a causal link solely with timing evidence, the adverse action must follow 'within a relatively short' time after the protected activity."), the circumstances identified by Plaintiff are not sufficiently related in time. In fact, the decision to terminate Plaintiff's leased-worker position occurred prior to Plaintiff's December 21, 2011 email to Unger.

In sum, APL is entitled to summary judgment on the Labor Code § 1102.5(b) claim.

///

- 14 -

12cv1717

### Reasons for Termination of the Leased-Worker Contract and Pretext

Even assuming Plaintiff could establish a prima facie case of retaliation, APL comes forward with evidence to show legitimate reasons for terminating Plaintiff's leased-worker position. The group supervisor of APL, Hopfinger, explains that APL does not have specific funding to maintain leased-workers without an active BUMED project to which to assign them. Even though APL offered Plaintiff a full-time position with APL, she rejected that offer, preferring to remain a leased-worker. Upon termination of the template project, "APL was not aware of any upcoming projects to assign Johnson." (Hopfinger Decl. ¶¶4, 5; Exh. 12).

On December 15, 2011, Hopfinger decided "to terminate Plaintiff's leased-worker position because APL did not have any projects to assign Johnson, nor was it aware of any upcoming projects that BUMED had decided to fund and assign to APL to which she could be assigned." Hopfinger also relates that he did not believe that "Johnson had been aggressive in attempting to achieve BUMED's goals" for the project "or advancing the project forward." (Id. ¶6). On December 19, 2011, Hopfinger signed a Notice of Termination of Leased Worker Services." (Id. Exh. 13).

The court concludes that APL has met its burden of demonstrating non-discriminatory reasons for terminating Plaintiff's position. Thus, the burden shifts to Plaintiff to show that the reasons are a pretext for discrimination.

Plaintiff first argues that, under Guz v. Bechtel, 24 Cal.4th 317, 354 (2000), her unidentified evidence of "direct evidence of discriminatory intent" means she does not have to show that APL's proffered legitimate reasons are pretextual. (Oppo. at p.25:9-11). The court notes that Guz discusses the classic McDonnell Douglas test as applied to employment discrimination laws. Id. at 354-56. The court could not locate in the California Supreme Court's opinion where it altered the McDonnell Douglas formulation. Notwithstanding, the court notes that certain evidence of retaliatory discrimination may be of such a character that it not only establishes a prima facie case but effectively rebuts any proffered legitimate reasons. However, that is not the case

1 here.

2 Next, Plaintiff sets forth several arguments, none of which are targeted to APL's proffered reasons (the completion of the BUMED contracts and the dissatisfaction with Plaintiff's performance). Plaintiff does not identify any BUMED contracts maintained by APL at the time of her discharge. While APL discussed potential upcoming BUMED projects at the "all hands" meeting where Plaintiff was present on or about December 12, 2011, Plaintiff fails to identify that, as of that point in time, APL possessed other BUMED projects. Further, Plaintiff presents no evidence that APL's dissatisfaction with Plaintiff's performance on the project was pretextual.

Accordingly, the court grants summary judgment in favor of APL, finding that it has come forward with unrebutted legitimate reasons for terminating Plaintiff's leased-worker position.

**The Wrongful Termination Claim**

To state a claim for wrongful termination, Plaintiff must show that her termination violated a fundamental public policy embodied in federal or state law. Green v., Talee Eng. Co., 19 Cal.4th 66, 84 (1998). The claim must be "tethered to fundamental policies that are delineated in constitutional or statutory provisions." City of Moorpark v. Superior Court, 18 Cal.4th 1143, 1159 (1998).

Plaintiff, who has the burden of demonstrating a genuine issue of material fact, sets forth a three-sentence argument in support of this claim. However, the failure to cite any evidence is fatal to this claim. Plaintiff cannot rest on the mere allegations or denials of a pleading, but must "go beyond the pleadings and by [the party's] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (citation omitted). As Plaintiff fails to identify any evidence in support of this claim, APL is entitled to summary judgment.

/ / /

/ / /

In sum, the court grants summary judgment in favor of APL and against Plaintiff on all claims. The Clerk of Court is instructed to close the file.

**IT IS SO ORDERED.**

DATED: August 8, 2013

Hon. Jeffrey T. Miller
United States District Judge

cc: All parties